UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRIAN SCOTT HILL,

                Petitioner,                      Hon. Robert Holmes Bell

v.                                          Case No. 1:06-CV-416

MARY BERGHUIS,

                Respondent.

_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on Hill's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Hill's petition be **denied**.


**BACKGROUND**

        As a result of events which occurred between December 1999 and June 2000, Petitioner was charged with three counts of second degree criminal sexual conduct.  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

**M.K.**

M.K. testified that he was presently 13 years of age and that he was born on August 2, 1988. (Trial Transcript, January 28, 2002, 126-27). M.K. began working for Petitioner "over the summer," performing various tasks, including installing drywall, mowing the lawn, and tearing the ceiling out of a bathroom. (Tr. 126-30). M.K. testified that Petitioner always paid him more than the agreed upon rate. (Tr. 148-49).

M.K. testified that the first day of his employment, Petitioner "come up behind me and put his arms around me and he'd swing back and forth." (Tr. 131-32). M.K. testified concerning another incident that occurred while he and Petitioner were working framing a bathroom in Petitioner's house. (Tr. 141-42). The pair took a break and began playing cards. (Tr. 141). Petitioner then placed his hands "under" M.K.'s shorts and began "rubbing" M.K.'s inner thighs. (Tr. 141-42). Petitioner then "touched" M.K.'s "scrotum." (Tr. 141-42). Petitioner "acted like he didn't do it on purpose" and "jerked back." (Tr. 141-42). M.K. "just got up and went back to work." (Tr. 142).

M.K. testified that on another occasion he said, "I suck," after hitting his shin on something. (Tr. 143-44). When Petitioner heard this, he unbuttoned his pants and said, "I'm ready." (Tr. 144). When M.K. explained he "didn't mean it that way," Petitioner said, "oh," and re-buttoned his pants. (Tr. 144). M.K. also testified that he would occasionally wrestle with Petitioner. (Tr. 144-45). When the pair would wrestle, Petitioner would "put his hands on [M.K.'s] private area." (Tr. 144). M.K. attempted to "push [Petitioner's] hand away," but "he'd put it back." (Tr. 144-45).

M.K. described another incident that occurred at the end of another workday. M.K. followed Petitioner to the computer room of Petitioner's house, so that he could receive his pay for

2

that day.  (Tr. 134-35).  Petitioner turned on his computer so that he could prepare a check for M.K. (Tr. 136).  While the pair was waiting for the computer to "warm up," Petitioner approached M.K., who was "sitting on the ground."  (Tr. 136).  Petitioner "pulled [M.K.] down" and began "rubbing [his] inner thighs and private area."  (Tr. 136).  When M.K. asked Petitioner "what he was doing," Petitioner responded that "he could make [M.K.] go to sleep."  (Tr. 136).  Petitioner then "grabbed [M.K.'s] penis and started rubbing up and down."  (Tr. 136-38).  M.K. again asked Petitioner "what he was doing," in response to which Petitioner stated, "I thought you wanted to know what sex felt like."  (Tr. 136-37).  M.K. responded, "no," and got up off the floor.  (Tr. 137).  Petitioner then prepared a check for M.K., who immediately departed Petitioner's residence.  (Tr. 137).  M.K. never returned to Petitioner's residence.  (Tr. 141).

M.K. testified that after performing these various acts, Petitioner would instruct him "not to tell anyone."  (Tr. 146).  M.K. testified that Petitioner showed him pornographic images and engaged in sexual banter with him.  (Tr. 146-48, 152-53).  M.K. testified that he was unsure of the precise dates on which these events occurred, but that they took place during the summer, but before he went to Georgia to see his friend R.S.  (Tr. 140-41).  M.K. testified that he celebrated his birthday while on vacation in Georgia.  (Tr. 150-51).

**Amy Schmidt**

Schmidt testified that she was R.S.'s mother.  (Tr. 161).  Prior to moving to Georgia, she and R.S. lived in the same neighborhood as M.K.  (Tr. 161).  Schmidt described M.K. as one of her son's "special friends" and "like a second son" to her.  (Tr. 161-63).  Schmidt testified that M.K. was "a very responsible little boy" who would "go door to door to other neighbors" asking if there

3

was work he could perform.  (Tr. 163).

Schmidt testified that M.K. stayed with her and her family in Georgia from mid-July through mid-August 2000.  (Tr. 164-65).  On or about July 26, 2000, M.K.'s mother, Jody Frohm, telephoned the Schmidt residence to speak with M.K.  (Tr. 164-65, 171-72).  M.K. was not available so Schmidt and Frohm spoke.  (Tr. 165).  Frohm indicated that Petitioner had telephoned her "numerous" times to let her know that he wanted M.K. to work for him.  (Tr. 165).  The following morning, Schmidt relayed this message to M.K.  (Tr. 166).  M.K. responded that he had informed his mother that "he would no longer work for" Petitioner.  (Tr. 166).  When Schmidt asked M.K. why he was unwilling to work for Petitioner, M.K. responded that Petitioner was "gay" and "touches him."  (Tr. 166).  When Schmidt asked M.K. where Petitioner touched him, M.K. stated, "everywhere all the time."  (Tr. 166).

Schmidt was eventually able to get M.K. to "open up" to her and tell her in greater detail what Petitioner had done to him.  (Tr. 166-67).  M.K. told Schmidt that Petitioner "had touched his penis on several occasions" and that Petitioner had "asked him to have sex" and "to suck him."  (Tr. 167).  M.K. told Schmidt that Petitioner told him that "he could show him what sex would feel like."  (Tr. 167).  M.K. told Schmidt that Petitioner showed him pornography and made sexual remarks to him.  (Tr. 167-69).

**Jody Frohm**

Frohm testified that she was M.K.'s mother.  (Tr. 180).  Frohm testified that "about" March 2000, Petitioner contacted M.K. directly to inquire about M.K. working for him.  (Tr. 181-82).  While M.K. was in Georgia, Petitioner telephoned Frohm asking when M.K. would be

4

returning home because "he had work for him to do." (Tr. 183). Frohm testified that Petitioner was "kind of anxious for [M.K.] to come back home." (Tr. 187). Frohm relayed Petitioner's message to Amy Schmidt. (Tr. 183-84). According to Frohm, Petitioner took her son golfing on two occasions and also took him out to dinner once. (Tr. 184-85).

Frohm testified that prior to the summer of 2000, M.K. was "active in school," had "a lot of friends," and participated in "all the sports." (Tr. 185-86). Following the summer of 2000, M.K. was "not very social anymore" and "doesn't want to go out for sports. . .because he didn't want to do a physical." (Tr. 187).

**Sergeant Jeffrey Lutz**

Lutz testified that for the past two years he "specialized in criminal sexual conduct and child abuse cases." (Tr. 189). Lutz spoke with M.K. on September 21, 2000. (Tr. 193). Lutz testified that M.K.'s responses to his questions were consistent and that he did not appear to have been coached, either intentionally or inadvertently. (Tr. 194). Lutz, who had been present in the courtroom during M.K.'s trial testimony, indicated that M.K.'s trial testimony was consistent with the statements he made during their September 21, 2000 interview. (Tr. 195).

**Brian Hill**

Petitioner testified that M.K. began working for him in May 2000. (Tr. 215). Petitioner testified that M.K. worked for him on six occasions and that he had contact with M.K. on two other occasions. (Tr. 216). Petitioner acknowledged that on "two occasions" he "initiated wrestling" with M.K. (Tr. 217). Petitioner asserted that it was "playful" and "not much more than

5

that." (Tr. 217). Petitioner also acknowledged that he "occasionally" he approached M.K. from "behind" and "grab[bed] him by the shoulders and just kind of tossed him around a little bit." (Tr. 218). Petitioner testified that he felt "close to" M.K. "like a fatherly type figure." (Tr. 218). Petitioner denied that he ever rubbed M.K.'s penis or touched his scrotum. (Tr. 218, 220). Petitioner also denied showing pornography to M.K. (Tr. 221-22, 224-25). Petitioner asserted that he telephoned M.K.'s residence while M.K. was on vacation because M.K. had not mowed his lawn before leaving as he had been paid to do. (Tr. 224).

Following the presentation of evidence, the jury found Petitioner guilty of two counts of second degree criminal sexual conduct. (Trial Transcript, January 29, 2002, 51-52). Petitioner was sentenced to serve 8-15 years in prison. (Sentence Transcript, February 25, 2002, 61-62). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I. Defendant's convictions must be reversed, and a new trial granted because trial counsel was constitutionally ineffective in failing to:
>
>> A. object to hearsay testimony of Amy Schmidt
>>
>> B. object to Amy Schmidt becoming a character witness for M.K.
>>
>> C. request a cautionary instruction to the jury when juror Hood stated during voir dire that those who fail a polygraph are guilty of sexual misconduct
>
> II. Defendant's convictions must be reversed, as trial counsel's failure to request instruction on the lesser included offenses of CSC Second Degree constituted ineffective assistance and denied Defendant a fair trial

III.   Defendant is entitled to a re-sentencing where the trial court erroneously scored him points under offense variable four and ten, and thereby increased the range of the recommended minimum sentence

IV.   Defendant must be re-sentenced, because the trial court's reasons for imposing an upward departure were not substantial and compelling, and were already taken into account by the guidelines scoring

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Hill*, No. 240591, Opinion (Mich. Ct. App., Nov. 13, 2003). Asserting the following claims, Petitioner moved in the Michigan Supreme Court for leave to appeal:

I.   Trial counsel was constitutionally ineffective in failing to object to hearsay testimony of Amy Schmidt

II.   Defendant must be re-sentenced because the trial court's reason for imposing an upward departure were not substantial and compelling and were already taken into account by the guidelines scoring

III.   Trial counsel was constitutionally ineffective in failing to call witnesses as requested by the defendant

IV.   Trial counsel was intentionally ineffective as a result of a conflict of interest

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Hill*, No. 125303, Order (Mich., June 10, 2004).

On or about July 15, 2005, Petitioner filed in the trial court a motion for relief from judgment. Noting that Petitioner had failed to raise in his direct appeal as of right any of the issues asserted in his motion for relief from judgment, the court denied Petitioner's motion for failure to comply with Michigan Court Rule 6.508(D)(3). *People v. Hill*, No. 01-51-FH, Order (Eaton County

7

Cir. Ct., Aug. 29, 2005).  Petitioner subsequently moved in the Michigan Court of Appeals for leave to appeal this determination, asserting the following claims:

> I. Defendant's constitutional right to effective assistance of counsel was violated when his attorney repeatedly failed to zealously represent his interests at trial
>
> II. Prosecuting attorney's failure to submit a complete list of witnesses irreversibly harmed Defendant counsel's ability to properly prepare for trial and consequently the proceeding was inherently unjust

The Michigan Court of Appeals denied Petitioner's request "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Hill*, No. 265627, Order (Mich. Ct. App., May 4, 2006).  Petitioner did not appeal this matter to the Michigan Supreme Court.  (Dkt. #17).  On June 15, 2006, Petitioner initiated the present action, asserting the following claims:

> I. Defendant's conviction must be reversed and a new trial granted because Defendant's trial counsel was constitutionally ineffective in failing to:
>
>> A. object to the hearsay testimony of Amy Schmidt
>>
>> B. object to Amy Schmidt becoming a character witness for M.K.
>>
>> C. request a cautionary instruction to the jury when one member of the jury stated during voir dire that he believed Defendant was guilty
>>
>> D. call character witnesses to testify regarding M.K.'s demeanor in the presence of Mr. Hill
>>
>> E. offer the personal check given to M.K.

8

> to impeach his credibility

> F.    conduct a forensic test of Defendant's computer to impeach the credibility of M.K.

> G.    call witnesses to substantiate M.K.'s contention that he was teased about his relationship with Defendant

> H.    call witnesses to establish that Defendant was not the individual who allegedly made an inappropriate comment to M.K. at a golf course

> I.    request a jury instruction on the lesser-included offenses of criminal sexual conduct

II.    Petitioner is entitled to a re-sentencing due to the trial court's improper point determination at Petitioner's sentencing

III.    Petitioner is entitled to a re-sentencing due to the trial court's improper upward departure from sentencing guidelines

IV.    Petitioner should be granted a new trial due to the trial court's improper endorsement of a prosecution witness not named on witness list

## STANDARD OF REVIEW

Hill's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was

adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529

10

U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

11

<u>**ANALYSIS**</u>

**I.**        **Ineffective Assistance of Counsel**

As noted above, Amy Schmidt testified concerning various statements that M.K. made to her during M.K.'s visit to Georgia.   Petitioner asserts that this testimony constituted inadmissible hearsay and that his trial counsel rendered ineffective assistance by failing to object to its admission.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688.   In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.   Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

Petitioner's counsel did not object to Schmidt's allegedly hearsay testimony

concerning M.K.'s statements to her.  Instead, counsel challenged whether Schmidt was qualified to interview M.K., obtaining the concession from Schmidt that she possessed "no training in questioning young children on criminal sexual conduct." (Trial Transcript, January 28, 2002, 173). Counsel then questioned whether Schmidt's interview tactics, rather than revealing what actually occurred, instead "laid the foundation for the story he told." (Tr. 174).  In closing argument, counsel argued that Schmidt planted the molestation story in M.K.'s head and helped him rehearse it.  (Trial Transcript, January 29, 2002, 15, 23).

In rejecting this claim, the Michigan Court of Appeals first observed that the evidence in question "arguably" did not even constitute hearsay.  *People v. Hill*, No. 240591, Opinion at 2 (Mich. Ct. App., Nov. 13, 2003) (citing to Mich. Rule Evid. 801(d)(1)(B)).  The court further observed that "[m]ore importantly, defense counsel used the questionable testimony to argue that the witness implanted the notion of wrongdoing in the victim's mind and then encouraged the victim to embellish his story and fabricate allegations from innocent events."  The court noted that "[w]hile obviously unavailing, this use of the questionable testimony demonstrates that the defense planned to preserve the testimony for its own purposes rather than object to its use by the prosecution." Accordingly, the court concluded that "defense counsel's failure to object represents trial strategy, not ineffective assistance."  *Id.*  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

13

II.                    **Improper Sentencing**

Petitioner asserts that he must be re-sentenced because the trial judge improperly sentenced him to a prison term in excess of that recommended by the sentencing guidelines. Petitioner asserts that his sentence violates various provisions of Michigan law.  Petitioner's claim that he is being confined in violation of state law, is not cognizable.  *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States").

To the extent that Petitioner's claim is interpreted as asserting that his sentence is disproportionate to his crime, such claim fails.  As the Sixth Circuit has observed, because the United States Constitution "contains no strict proportionality guarantee," a claim that the sentencing court violated Michigan's principles of proportionality is not cognizable on federal habeas review. *Lunsford v. Hofbauer*, 1995 WL 236677 at *2 (6th Cir., April 21, 1995) (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991)); *Butz*, 2009 WL 33462 at *4 (citing *Lunsford*, 1995 WL 236677 at *2).  Moreover, the Eighth Amendment to the United States Constitution "does not require strict proportionality between crime and sentence."  *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (quoting *Harmelin*, 501 U.S. at 1001).  Instead, the Eighth Amendment simply forbids extreme sentences that are "grossly disproportionate" to the crime committed.  *Layne*, 324 F.3d at 473.  In this case, Petitioner's sentence is in no way "grossly disproportionate" to the crime committed.  Accordingly, this claim is without merit.

14

III.            **Remaining Claims**

A petition for writ of habeas corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  The exhaustion requirement "is satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008) (citation omitted).  As detailed above, the only habeas claims that Petitioner has presented to the Michigan Supreme Court are the two claims discussed above.  The remaining claims asserted in Hill's petition for writ of habeas corpus have not been properly exhausted.

Furthermore, Petitioner is unable to return to state court and exhaust these issues by filing a motion for relief from judgment.  Michigan court rules provide that a defendant can file only one such motion, *see* M.C.R. 6.502(G)(1), and Petitioner has already filed his.[1]  When a petitioner has failed to properly exhaust a particular claim, and there exists no available remedy by which such failure can be corrected, the Court must determine whether there exists cause and prejudice to excuse his failure to present the claim in state court.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996);

---

[1]  The Court notes that Michigan Court Rule 6.508(D)(3) appears to indicate that Petitioner *may*, in fact, be entitled to bring a second motion for relief from judgment upon a showing of cause and prejudice.  Assuming this interpretation is accurate, the determination whether Petitioner can satisfy the requirements of a particular Michigan court rule seems to be a matter for the courts of the State of Michigan to decide.  *See, e.g., Lukity v. Elo*, 2000 WL 1769507 at *4 (E.D.Mich., Oct. 10, 2000) ("[g]iven the inability to conclude that there is an absence of available state corrective procedures, the principles of federal-state comity dictated by the exhaustion doctrine compel this Court to defer to the State of Michigan to interpret its own postconviction statute").  The Court notes, however, that this is an approach with which the Sixth Circuit disagrees.  *See Dorch v. Smith*, 105 Fed. Appx. 650 (6th Cir., June 25, 2004) (finding that petitioner was unable to file a second motion for relief from judgment pursuant to M.C.R. 6.502(G)); *Paffhousen v. Grayson*, 2000 WL 1888659 (6th Cir., Dec. 19, 2000) (same); *Bostic v. Abramajtys*, 1999 WL 96738 (6th Cir., Feb. 3, 1999) (same).  The Court need not attempt to resolve this dispute, however, because as discussed below the unexhausted claims asserted in Hill's petition are without merit.  Thus, even if it were determined that Petitioner could pursue a second post-conviction motion, the Court would recommend in the alternative that the unexhausted claims at issue be denied as meritless.  *See* 28 U.S.C. § 2254(b)(2) (indicating that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

*Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner has failed to demonstrate that there exists cause or prejudice for his failure to properly exhaust the claims in question. The Court is, therefore, precluded from addressing the merits of these claims. Even if Petitioner could make such a showing, however, the result is the same as these claims are without merit.

As discussed below, some of Petitioner's unexhausted claims were addressed by the Michigan Court of Appeals in Petitioner's direct appeal. The Court has evaluated these particular claims pursuant to the deferential AEDPA standard articulated above. With respect to those unexhausted claims which the state courts have not addressed, the Court has conducted a de novo review. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

### A.    Ineffective Assistance of Counsel

### 1.    Failure to Introduce Evidence

Petitioner asserts that his trial attorney was ineffective for failing to: (1) call character witnesses to testify regarding M.K.'s demeanor in Petitioner's presence; (2) offer the personal check given to M.K. to impeach his credibility; (3) conduct a forensic test of Petitioner's computer to impeach the credibility of M.K.; (4) call witnesses to substantiate M.K.'s contention that he was teased about his relationship with Petitioner; and (5) call witnesses to establish that Petitioner was not the individual who allegedly made an inappropriate comment to M.K. at a golf course.

Even if the Court assumes that Petitioner's attorney was ineffective for failing to

introduce these various items of evidence, Petitioner has failed to establish that he was prejudiced as a result of his attorney's shortcomings. Petitioner has presented no evidence that any alleged character witnesses would have provided favorable testimony. Petitioner has failed to establish that the personal check that he allegedly gave to M.K. (a) exists or (b) that its admission would have advanced his cause. Petitioner has submitted no evidence that a forensic test of his computer would have yielded beneficial results. Petitioner has failed to identify any witness that could have testified that M.K. was teased about his relationship with Petitioner or that any such witness would have provided favorable testimony. Finally, Petitioner has failed to identify any witness that could have testified about the alleged incident that occurred at a golf course or that any such witness would have provided favorable testimony. Accordingly, these claims are without merit.

   2.   Amy Schmidt

On direct examination of Amy Schmidt, the following exchange occurred between Schmidt and the prosecutor:

> Q:   Ms. Schmidt, when you knew [M.K.] back when you lived in Olivet what was his reputation like as far as what type of boy was he?
>
> A:   [M.K.] was a strong athlete. He was a pro athlete. He was, he played every sport that Olivet has to offer. He was, did extremely well in every sport.
>
> Q:   Were you involved in a sports program at Olivet?
>
> A:   Yeah. I coached fourth and fifth grade girls' basketball. And [M.K.] had excellent grades. He was, he won citizenship awards during this awards ceremony at the end of the school year because everybody loved [M.K.]. [M.K.] was very outgoing,

very outspoken.  He, he just, you know, loves people.
He loves to be around people.  Likes to be a show off,
you know, because he was so good at sports.  And just
a wonderful, bright, young boy.

(Trial Transcript, January 28, 2002, 170-71).

Petitioner asserts that this testimony constituted improper character evidence and that his attorney was ineffective for failing to object to its admission.  Even if counsel was ineffective for failing to object to this testimony, Petitioner has failed to demonstrate that he was prejudiced thereby.  Schmidt did not testify as to M.K.'s character for truthfulness in an attempt to improperly bolster his credibility, but instead simply described M.K. based on her first-hand experience and knowledge.  Given the wealth of evidence against Petitioner, this testimony was not so damaging that its introduction "snatched [defeat] from the hands of probable victory."

The Michigan Court of Appeals rejected this claim.  *People v. Hill*, No. 240591, Opinion at 2 (Mich. Ct. App., Nov. 13, 2003).  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim presents no issue on which habeas relief may be granted.


3.      Voir Dire

During the voir dire process, juror Russell Hood was selected to replace a potential juror that had been excused.  (Trial Transcript, January 28, 2002, 88-89).  Upon his selection, the following exchange occurred:

THE COURT:      Have you been able to hear and  understand all the questions, sir?

18

JUROR HOOD:     Yes.

THE COURT:      Would you have felt the need to reveal anything in response to any of the questions that you've heard so far?

JUROR HOOD:     You sat in for Judge Eveland on my divorce.

THE COURT:      All right.

JUROR HOOD:     I've met Detective Lutz before and well was on both sides of the spectrum as a, not by this case.

THE COURT:      What do you mean by that?

JUROR HOOD:     I was accused of sexual misconduct (inaudible).

THE COURT:      You were?  And nothing came,  nothing came of it?  There was an accusation that was made?

JUROR HOOD:     There was an accusation but I was proven beyond without a doubt that I was, that I wasn't guilty.

THE COURT:      Did it result in any criminal prosecution?

JUROR HOOD:     No.  Nobody was prosecuted (inaudible).

THE COURT:      All right.  But the allegation was made and you had to refute it and you were involved?

JUROR HOOD:     Yes.

THE COURT:      How long ago was this?

JUROR HOOD:     The year 2000.

THE COURT:      The year 2000.

JUROR HOOD:     June of 2000.

THE COURT:      And what other, you said you were on the other side of things.

JUROR HOOD:     There was a, a boyfriend of my ex-wife's also.   Well the allegation shifted to him.  And well the end result he took a

polygraph test and he failed.

THE COURT:     All right.  So this was, you weren't accused of, of a child here?  It was an ex-wife situation?  There was a boyfriend?

JUROR HOOD:   Yes.

THE COURT:     Was Detective Lutz involved in this?

JUROR HOOD:   Yes.  He was the person checking all suspects.

THE COURT:     All right.  Now is this going to weigh one way or the other - -

JUROR HOOD:   No, I don't think - -

THE COURT:     - - on this case?

JUROR HOOD:   - - it's going to bother me on this one.

THE COURT:     It won't impact you one way or the other because this could slice, cut different ways here.

JUROR HOOD:   No, I, I've kind of gotten this - - that's why I said it's, I've been on both sides of the spectrum.

THE COURT:     All right.

JUROR HOOD:   So I didn't, I know what it's like to be in the middle, you've just got to - - this is a new case.  It's not (inaudible).

THE COURT:     All right.  Detective Lutz is going to be sitting here and he's going to testify in this case.  He's going to be there at that table throughout this trial.  Is that going to factor in at all, the fact that you know him?

JUROR HOOD:   No.

THE COURT:     You'd weigh his testimony the same way you would anyone else's, by the same standards?

JUROR HOOD:   Yes.

THE COURT:     All right.  The fact that I handled your divorce, substituting for

20

|  | Judge Eveland, doesn't really matter if any of these jurors know me. |
|---|---|
| JUROR HOOD: | No. |
| THE COURT: | Or had any contact with me so long as it doesn't factor into the case.  No problem in that area? |
| JUROR HOOD: | No. |
| THE COURT: | Anything else at all about you? |
| JUROR HOOD: | No.  None. |
| THE COURT: | You work at GM.  You previously worked at, forklift operator, store detective, window assembly.  Any of those things factor in? |
| JUROR HOOD: | No. |
| THE COURT: | All right.  Mr. Eagen. |
| MR. EAGEN: | Mr. Hood, were you able to hear the questions I asked the jury panel? |
| JUROR HOOD: | Yes. |
| MR. EAGEN: | And were there any of those questions that you feel you would have to give information about? |
| JUROR HOOD: | No. |
| MR. EAGEN: | As far as this situation where you were accused of this type of offense, Detective Lutz was the investigating officer on that? |
| JUROR HOOD: | Yes. |
| MR. EAGEN: | And it was his investigation that cleared you? |
| JUROR HOOD: | I guess it was - - really it was Dr. Guertin's report. |
| MR. EAGEN: | Dr. Guertin's report did? |
| JUROR HOOD: | Right. |

21

MR. EAGEN:    Now the facts in that case are, may be different from the facts in this case.  Can you put that aside, that experience that you've had - -

JUROR HOOD:  Yeah.

MR. EAGEN:    - - and decide this case based on the evidence that you hear?

JUROR HOOD:  Yes.

MR. EAGEN:    And you understand that in these type of cases, criminal sexual conduct in the second degree, all that is required is touching so there is not going to be the physical evidence that's going to be presented in this case.  Can you still return a verdict of guilty if you feel I've proven the elements by beyond a reasonable doubt with no physical evidence?

JUROR HOOD:  Yes.

MR. EAGEN:    And also when we talk about the victim in this case being under the age of thirteen, he was actually eleven at the time, do you feel if you believe him that you're going to be able to return a verdict of guilty by beyond a reasonable doubt?

JUROR HOOD:  Yes.

MR. EAGEN:    Okay.  (Inaudible)

JUROR HOOD:  Yes.

MR. EAGEN:    All right.  No further questions, Your Honor.

THE COURT:    Mr. Maddaloni.

MR. MADDALONI:    Just my standard question.  Do you believe you could start on the fifty yard line?

JUROR HOOD:  Yes, sir.

MR. MADDALONI:    Okay.  No more questions, Your Honor.

(Tr. 89-94).

Petitioner asserts that his trial attorney was ineffective for failing "to request a

22

cautionary instruction to the jury after [Hood] had stated that he believed that Defendant was guilty." Juror Hood neither stated that he believed Petitioner was guilty nor stated anything that can reasonably be interpreted as asserting such. The Michigan Court of Appeals addressed this claim, concluding that counsel's decision to not request a cautionary instruction was appropriate. Specifically, the court stated:

> Defendant next claims that his trial counsel erroneously failed to request a jury instruction to disregard a prospective juror's comments about polygraph examinations. The comments referred to the juror's successful completion of a polygraph examination to defeat CSC accusations in an unrelated case. During trial, the jurors never heard any evidence that defendant or the victim took a polygraph examination, so the juror's comments were innocuous. If defendant's trial counsel had requested a cautionary instruction, the entire jury pool might reasonably conclude that defendant had taken a polygraph examination in this case, and presumably failed it. Defendant's counsel strategically refrained from requesting the counterproductive instruction and did not provide ineffective assistance on this basis.

*People v. Hill*, No. 240591, Opinion at 2 (Mich. Ct. App., Nov. 13, 2003).

The decision by the Michigan Court of Appeals concerning this issue is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim is without merit.


4.          Jury Instruction

As noted above, Petitioner was charged with three counts of second degree criminal sexual conduct. Petitioner asserts that his trial attorney rendered ineffective assistance of counsel by failing to request that the jury be instructed on the lesser included offenses of fourth degree

criminal sexual conduct, attempted criminal sexual conduct, and assault with the intent to commit second degree criminal sexual conduct. The Michigan Court of Appeals addressed this claim and found that given the facts presented at trial, "the trial court could not [under Michigan law] properly instruct on any of these lesser offenses." *People v. Hill*, No. 240591, Opinion at 2 (Mich. Ct. App., Nov. 13, 2003). The Court agrees.

The evidence revealed that Petitioner *actually* engaged in criminal sexual conduct, thus instructions regarding *attempted* criminal sexual conduct or assault with the *intent* to commit criminal sexual conduct were not appropriate. Furthermore, an instruction as to fourth degree criminal sexual conduct was likewise inappropriate. Under Michigan law, criminal sexual conduct involving a victim "under 13 years of age" constitutes second degree criminal sexual conduct. Mich. Comp. Laws § 750.520c. Moreover, the evidence did not support an instruction as to fourth degree criminal sexual conduct, as the requirements of that offense were not satisfied by the evidence presented at trial. Mich. Comp. Laws § 750.520e.

The decision by the Michigan Court of Appeals concerning this issue is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim is without merit.

B.    Incorrect Sentence Calculation

Petitioner asserts that he "is entitled to a resentencing" because the trial court incorrectly calculated the relevant sentencing guidelines. Specifically, Petitioner asserts that the trial court improperly calculated offense variables 4 and 10.

24

To the extent that Petitioner asserts that the trial court violated Michigan law by incorrectly calculating the relevant offense variables, such is not cognizable. *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States"). To the extent that Petitioner is challenging the severity of his sentence, such claim fails for the reasons articulated in Section II above.

Finally, to the extent that this claim is interpreted as challenging the information on which Petitioner's sentence was based, such claim also fails. It has long been recognized that when imposing sentence, "courts have broad discretion to consider various kinds of information." *United States v. Watts*, 519 U.S. 148, 151 (1997); *see also*, *Roberts v. United States*, 445 U.S. 552, 556 (1980) (a "fundamental sentencing principle" is that "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come").

Sentences imposed on the basis of "misinformation of constitutional magnitude," however, may present grounds for habeas corpus relief. *Roberts*, 445 U.S. at 556 (citations omitted). To prevail on a claim that he was sentenced on the basis of such misinformation, Petitioner must establish that "the disputed information was materially false and that the trial court relied on the information." *United States v. Andrews*, 240 F.Supp.2d 636, 638 (E.D. Mich. 2003) (quoting *Collins v. Buckhoe*, 493 F.2d 343, 345-46 (6th Cir. 1974)).

Petitioner asserts that in calculating his sentencing guideline score, offense variables 4 and 10 were improperly calculated and that the trial judge relied on such when determining his sentence. However, Petitioner has not demonstrated that these particular offense variables were improperly scored or based upon inaccurate information. The Court notes that the Michigan Court

25

of Appeals expressly concluded that these offense variables were properly calculated. *People v. Hill*, No. 240591, Opinion at 2 (Mich. Ct. App., Nov. 13, 2003). This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim is without merit.

C.        Improper Witness Endorsement

At the outset of trial, the prosecution moved to amend its witness list to permit Jody Frohm to testify. (Trial Transcript, January 28, 2000, 4-5). The court granted the prosecution's motion. (Tr. 9-11). The court also expressly afforded Petitioner an opportunity to interview Frohm prior to her taking the stand and, furthermore, instructed the prosecutor to inform Petitioner beforehand of "everything" that Frohm would be questioned about at trial. (Tr. 10). Petitioner asserts that the decision to permit Frohm to testify was improper and entitles him to a new trial.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357-58.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law."

26

*Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.  *Id.*  In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly."  *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.* (citations omitted).

The decision by the trial court to allow Frohm to testify did not deprive Petitioner of a fair trial.  The prosecutor asserted to the trial court that the failure to timely identify Frohm as a witness was an honest mistake.  (Trial Transcript, January 28, 2000, 6).  Petitioner has presented neither evidence nor argument suggesting otherwise.  Putting aside the timing of the prosecutor's motion, it should hardly have surprised Petitioner that the prosecutor wanted to question the victim's mother.  Thus, this was certainly not a circumstance in which the prosecutor was attempting to identify at the last minute an unknown or "surprise" witness.  Also, as noted above the trial court attempted to accommodate Petitioner by affording him an opportunity to interview Frohm and requiring the prosecutor to inform Petitioner of "everything" about which Frohm would testify.  In sum, while it would undoubtedly have been preferable for Frohm to have been timely identified as a witness, the failure to do so did not deprive Petitioner of a fair trial.  Accordingly, this claim presents no issue on which habeas relief may be granted.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Hill's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  April 6, 2009                       /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge

28